TJOFLAT, Circuit Judge, specially
concurring:
I concur only in the court’s judgment. I cannot quibble with the court’s finding that Supreme Court precedent does not prevent the State of Georgia from applying a beyond-a-reasonable-doubt standard to Hill’s claim that he is mentally retarded. However, I do not believe we ought to reach this conclusion for two reasons. First, burdens of proof are procedural rules and are governed by laws pertaining to procedural due process. Second, Hill raised his mental retardation claim — and the associated claim regarding the beyond-a-reasonable-doubt standard — in a state post-conviction proceeding, as opposed to during his criminal trial. These two points combine to form Hill’s true claim: that he deserves habeas relief because the State violated his procedural due process rights during a post-conviction proceeding. Such claims do not form the basis of habeas relief, and I would affirm the district court’s judgment on that ground.
Georgia law provides that defendants accused of murder may avoid the death penalty if they prove that they are mentally retarded beyond a reasonable doubt. O.C.G.A. § 17 — 7—131(c)(3). Hill could have raised this defense during the guilt phase of his 1991 criminal trial; for some reason, he did not. Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52, 52 (1998). The Georgia courts forgave this obvious procedural default and permitted Hill to argue his mental-retardation defense in a post-conviction proceeding. Id. at 53. The Georgia courts did not vacate Hill’s sentence and, in effect, re-open his criminal trial. The Georgia Supreme Court rejected the post-conviction trial court’s initial decision to issue a limited writ of habeas corpus and hold a jury trial on the mental-retardation defense, which would have presumably reopened his conviction for this limited proceeding. Id. at 53-54. Rather, the court permitted Hill to raise the issue without a jury during the post-conviction proceeding. Id. It was during that proceeding that Hill argued that Georgia’s beyond-a-reasonable-doubt standard conflicted with the Supreme Court’s decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[1] Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 618, 620-22 (2003).
The court and I part ways at the starting point of its analysis. The court accepts and responds to Hill’s argument as he presents it — that Georgia’s beyond-a-reasonable-doubt standard somehow violates *1362 the rule laid out in Atkins that the Eighth Amendment prohibits the execution of the mentally retarded. But Hill’s real argument, framed properly, is not an Eighth Amendment argument; it is that the beyond-a-reasonable-doubt standard denies him due process of law.
Burdens of proof are procedural rules governed by norms of procedural due process. See Medina v. California, 505 U.S. 437, 446-48, 112 S.Ct. 2572, 2577-78, 120 L.Ed.2d 353 (1992) (deciding whether shifting the burden of proof to the defendant to demonstrate that he is incompetent to stand trial violates a defendant’s due process rights); Sandstrom v. Montana, 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1979) (“[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt .... ” (quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970))). The Eighth Amendment inquiry in Atkins, in contrast, had nothing to do with due process. The Court’s holding was based solely on the “evolving standards of decency” inquiry into whether executing the mentally retarded was excessive punishment. Atkins, 536 U.S. at 311-12, 122 S.Ct. at 2247. So, by challenging the beyond-a-reasonable-doubt standard, Hill’s claim is not properly an Eighth Amendment claim, but one cognizable under due process. As such, Hill’s real complaint is not that he is mentally retarded, and that the state post-conviction court’s contrary conclusion was erroneous. Hill instead argues that the state post-conviction proceeding utilized an unfair procedure for determining whether he is mentally retarded.
With Hill’s argument framed in this way, the forum in which Hill made his argument is of paramount importance. We would of course address his due process claim if the allegedly foul process occurred during his criminal trial. E.g., Wright v. Sec’y for Dep’t of Corr., 278 F.3d 1245, 1256 (11th Cir.2002) (addressing, under 28 U.S.C. § 2254, the petitioner’s claim that the state trial court violated his procedural due process rights because he was incompetent to stand trial). If Hill had raised his mental-retardation defense at trial, and raised this challenge to the beyond-a-reasonable-doubt standard there, he could claim that his conviction and sentence were tainted by a violation of his due process rights.[2]
Due process violations during state post-conviction proceedings do not, however, form the basis of habeas relief. Carroll v. Sec’y, Dep’t of Corr., 574 F.3d 1354, 1365 (11th Cir.2009); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir.2004). The habeas statute permits federal courts to grant habeas relief to state prisoners on the ground that they are “in custody pursuant to the judgment of a State court” in violation of federal law. 28 U.S.C. § 2254(a). State post-conviction proceedings are not the “judgment” that resulted in the prisoner’s detention. See Carroll, 574 F.3d at 1365 (“[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment — i.e., the conviction itself .... ”). Post-conviction proceedings are instead “civil in nature and are not part of the criminal proceeding itself.” Pennsylvania v. Finley, 481 U.S. 551, 556-57, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987).
*1363 Therefore, procedural violations during state post-conviction proceedings are “issues unrelated to the cause of the petitioner’s detention.” Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir.1987). As such, they cannot form the basis for habeas relief. See, e.g., Carroll, 574 F.3d at 1365 (holding that a failure to hold an evidentiary hearing in a state post-conviction proceeding was not a basis for habeas relief); In re Rutherford, 437 F.3d 1125, 1127 (11th Cir.2006) (finding insufficient for habeas relief the petitioner’s claim that the state post-conviction court denied him due process by failing to provide mental health records of a person the petitioner alleged had actually committed the crime (citing Quince, 360 F.3d at 1261-62)); Quince, 360 F.3d at 1262 (rejecting a habeas petition, which alleged that the state judge presiding over the petitioner’s post-conviction hearing denied the petitioner due process by not recusing himself, because the claim did not relate to the petitioner’s conviction).
The alleged due process violation in Hill’s case occurred during a state post-conviction proceeding, and not during his criminal trial.[3] The process afforded Hill during that proceeding therefore had no bearing on the judgment that lead to his conviction and sentence. A writ of habeas corpus is not the proper remedy for this alleged wrong.
Hill should instead have used this alleged due process violation as a means for obtaining an evidentiary hearing in federal court. A hypothetical application of the Antiterrorism and Effective Death Penalty Act (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254, to Hill’s case will demonstrate why this is so.
As my previous discussion implies, Hill’s only claim cognizable for habeas relief is that he is mentally retarded and cannot constitutionally be executed pursuant to the Eighth Amendment. Because the Georgia courts determined that he was not mentally retarded, Hill must first overcome 28 U.S.C. § 2254(d)’s deferential hurdle. Cullen v. Pinholster, 536 U.S. -, 131 S.Ct. 1388, 1398-1400, 179 L.Ed.2d 557 (2011) (holding that federal courts must first determine whether a petitioner satisfies § 2254(d) before they may consider new evidence acquired during a federal hearing). This determination was of a factual nature, and therefore falls under § 2254(d)(2)’s instruction that federal courts may not grant habeas relief unless the state court decision “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). The district court, or this court on appeal, would review the evidence introduced at Hill’s post-conviction hearing and determine if the state court’s ultimate finding of fact — that Hill was not mentally retarded — was “objectively unreasonable.” See Lockyer v. Andrade, 538 U.S. 63, 76, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003) (explaining that § 2254(d)(l)’s “unreasonable application” clause bars federal habeas relief unless the state court’s decision was “objectively unreasonable,” which is not synonymous with “clear error” or other “independent review” by the federal court) (citing Williams v. Taylor, 529 U.S. 362, 409, 120 S.Ct. 1495, 1521, 146 L.Ed.2d 389 (2000)).
If the federal court found the Georgia courts’ determination unreasonable, the federal court would then decide, in its independent judgment, whether Hill actually *1364 was mentally retarded. See McGahee v. Ala. Dep’t of Corr., 560 F.3d 1252, 1266 (11th Cir.2009) (reviewing a petitioner’s claim de novo after determining that the petitioner satisfied § 2254(d)). At this point, Hill would likely ask for an evidentiary hearing; questions of mental retardation are, as his state proceedings suggest, incredibly fact intensive. To be eligible for an evidentiary hearing, Hill would then need to demonstrate that he was diligent in attempting to develop the factual underpinnings of his claim. 28 U.S.C. § 2254(e)(2) (restricting a district court’s discretion to hold evidentiary hearings where the petitioner “failed to develop the factual basis of a claim in State court proceedings”); Williams v. Taylor, 529 U.S. 420, 430, 120 S.Ct. 1479, 1487, 146 L.Ed.2d 435 (2000) (“ ‘[F]ailed to develop’ implies some lack of diligence .... ”). Nothing in the record suggests that Hill would be barred by § 2254(e)(2)’s restriction. Therefore, the district court would have had the discretion to hold an evidentiary hearing according to pre-AEDPA rules. Williams v. Allen, 542 F.3d 1326, 1346-47 (11th Cir.2008) (analyzing the petitioner’s request for an evidentiary hearing under the standards set out by Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)).
At this point, Hill could have argued that the district court was required to hold an evidentiary hearing because the beyond-a-reasonable-doubt standard deprived him of a “full and fair hearing.” See Kelley v. Sec’y for Dep’t of Corr., 377 F.3d 1317, 1334 (11th Cir.2004) (quoting Toumsend, 372 U.S. at 313, 83 S.Ct. at 757); see also Quince, 360 F.3d at 1262-63 (stating that the state post-conviction judge’s conflict of interest could have been a basis for arguing that the state post-conviction proceeding was not “full and fair”).[4] His argument here would mirror the grounds he asserts for habeas relief. Claims of mental retardation are incredibly fact-intensive and could devolve into a swearing match between conflicting, and equally qualified, experts. This swearing match could easily — if not always — create reasonable doubt that the defendant is not mentally retarded.[5] By erecting this higher burden, the State effectively put its thumb on the scale against a defendant’s mental-retardation defense. The state post-conviction trial court demonstrated this point; it found Hill mentally retarded by a preponderance of the evidence, but not beyond a reasonable doubt. Therefore, the State’s unfair thumb — the beyond-a-reasonable-doubt standard — deprived Hill of full and fair post-conviction hearing, and he would be entitled to an evidentiary hearing in federal court.[6]
*1365 The previous paragraphs illustrate how Hill should have attacked the beyond-a-reasonable-doubt standard applied during his state post-conviction hearing. Instead, he asks this court for a writ of habeas corpus — and not an evidentiary hearing— to remedy this alleged due process violation. I would therefore affirm the denial of Hill’s petition because due process violations during state post-conviction proceedings are not grounds for habeas relief.
BARKETT, Circuit Judge, dissenting, in which MARCUS and MARTIN, Circuit Judges, join:
Although Georgia was the first state to declare that the mentally retarded should not be executed, it is the only one to guarantee precisely the opposite result by requiring offenders to prove beyond a reasonable doubt that they are mentally retarded.[1] Requiring proof beyond a reasonable doubt, when applied to the highly subjective determination of mental retardation, eviscerates the Eighth Amendment constitutional right of all mentally retarded offenders not to be executed, contrary to Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
The fallacy underlying the majority’s opinion is its belief that because Atkins “made no reference to, much less reached a holding on, the burden of proof,” there is no “clearly established” Supreme Court precedent that explicitly tells us that the beyond a reasonable doubt standard is unconstitutional. Thus, the majority holds that it must defer to the state court’s decision upholding this standard. Taken to its logical conclusion in this case, such deference permits states to adopt procedures that effectively exclude nearly every mentally retarded offender from the protection of Atkins. This deference requires so detailed and demanding a level of specificity in Supreme Court holdings that it eliminates any federal review whatsoever. Indeed, the State’s position, endorsed by the majority, is that Atkins does not preclude the State from setting the bar of proof as high as it wishes or defining mental retardation to include only those persons whose IQ falls below 30, a level which includes only 4% of the mentally retarded, thereby leaving 96% of all recognized mentally retarded persons subject to execution. This cannot be squared with the command of Atkins, which protects all of the mentally retarded from execution— whether their mental retardation is mild or severe. And when a state court decision eviscerates the substantive constitutional right the Supreme Court has explicitly recognized, it is contrary to that Supreme Court precedent.
For the reasons amplified below, I believe that Supreme Court precedent has clearly established that no State is constitutionally permitted to execute mentally retarded offenders. Nor does the State have unfettered discretion to establish pro *1366 cedures that through their natural operation will deprive the vast majority of mentally retarded offenders of their Eighth Amendment right not to be executed. Because the state court’s decision is contrary to clearly established Supreme Court law, it is owed no AEDPA deference. See 28 U.S.C. § 2254(d).[2]
I. Atkins Clearly Established that the Eighth Amendment Protects All Mentally Retarded Offenders from Execution
The majority first errs in suggesting that Atkins did not clearly establish that all of the mentally retarded are protected from execution. Contrary to both the majority’s assertion that “Atkins did not bestow a substantive Eighth Amendment right to a fixed and rigid definition of mentally retarded persons” and the State’s contention that it could, if it chose to do so, limit the protection of Atkins to those with an IQ of 30 or below, the Supreme Court extended the Eighth Amendment right to the entire class of mentally retarded, which it recognized in Atkins ranges from those with mild to profound mental retardation.
Relying on the medical consensus embodied in the clinical manuals of the American Psychiatric Association (APA) and the American Association on Mental Retardation (AAMR),[3] the Supreme Court recog *1367 nized that mental retardation spans a spectrum of intellectual impairment, ranging from mild to moderate to severe to profound mental retardation. See Atkins, 536 U.S. at 309 n. 3, 317 n. 22, 122 S.Ct. 2242 (citing APA, Diagnostic and Statistical Manual of Mental Disorders 41-43 (4th ed. 2000) (“DSM-IV”); AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992) (“AAMR 1992 Manual”)); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442 n. 9, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (acknowledging that “[m]entally retarded individuals fall into four distinct categories” — mild, moderate, severe and profound). Atkins’ s command to enforce the substantive constitutional right applies to this entire “range of mentally retarded offenders about whom there is a national consensus.” Atkins, 536 U.S. at 317, 122 S.Ct. 2242.
Moreover, within the universe of all mentally retarded individuals, 89% fall in the mildly mentally retarded range, a fact the Supreme Court recognized many years before Atkins was decided. See Cleburne Living Ctr., 473 U.S. at 442 n. 9, 105 S.Ct. 3249. See also DSM-IV at 41-43 (classifying 89% of the universe of mentally retarded as mild, 7% as moderate, and the remaining 4% as severe or profound). Indeed, Atkins specifically recognized that “[m]ild mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.” 536 U.S. at 309 n. 3, 122 S.Ct. 2242. More importantly, the Court had previously recognized that the mildly mentally retarded were the only members of the class of all mentally retarded who would be likely to reach the point of sentencing in criminal cases. See Penry v. Lynaugh, 492 U.S. 302, 333, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (citing ABA Standards for Criminal Justice 7-9.1, commentary, p. 460 (2d ed. 1980)). Thus, of those who are mentally retarded, it is the mildly mentally retarded who not only are entitled to Atkins protection, but are most likely to need it.
The state court’s decision, however, endorses the use of a standard of proof so high that it effectively limits the constitutional right protected in Atkins to only those who are severely or profoundly mentally retarded. In holding that Atkins applies only to “those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt,” Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 622 (2003), Georgia’s determination is directly contrary to Atkins’s command to protect from execution all of the mentally retarded. That a mildly mentally retarded individual’s “mental deficiencies” are less “significant” than the deficits of one who is severely or profoundly mentally retarded does not alter the indisputable fact that both are mentally retarded and entitled to the protection of the Eighth Amendment. Indeed, the offender in Atkins himself was only mildly mentally retarded. Atkins, 536 U.S. at 308, 122 S.Ct. 2242. Thus, when the Supreme Court announced that “the Constitution places a substantive restriction on the State’s power to take the life of a mentally retarded offender,” id. at 321, 122 S.Ct. 2242, there can be no doubt that it was extending this protection to all of the mentally retarded, whether classified as mild or “significant enough to be provable beyond a reasonable doubt.” Head v. Hill, 587 S.E.2d at 622.
II. States May Not Procedurally Eviscerate Substantive Constitutional Rights
The majority also errs in holding that Atkins does not place any constitutional restraint on state procedures pertaining to the execution of the mentally retarded. In Atkins, the Supreme Court not only prohibited the execution of any mentally re *1368 tarded offender, but also commanded states to “develop[] appropriate ways to enforce the constitutional restriction upon their execution of sentences.” 536 U.S. at 317, 122 S.Ct. 2242. Thus, states have an affirmative duty to “developf ] appropriate ways to enforce” the constitutional right of the mentally retarded.
Notwithstanding the command to enforce the constitutional restriction, the majority holds that states have complete discretion to choose any procedures to govern the determination of mental retardation. Not only is this position based on a flawed reading of Atkins, it is also contrary to Bailey v. Alabama, which clearly establishes that if a State’s procedures transgress a substantive constitutional right, “in their natural operation,” those procedures are unconstitutional. 219 U.S. 219, 239, 245, 31 S.Ct. 145, 55 L.Ed. 191 (1911).[4]
In Bailey, a defendant successfully challenged, as a violation of the Thirteenth Amendment, a state procedural rule. Id. at 244, 31 S.Ct. 145. Although the Court in Bailey recognized that states generally possess the power to prescribe procedures affecting their own laws, the Court went on to hold that this state power is limited when federal constitutional rights are at stake:
[WJhere the conduct or fact ..., itself falls within the scope of a provision of the Federal Constitution, a further question arises. It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions. And the state may not in this way interfere with matters withdrawn from its authority by the Federal Constitution, or subject an accused to conviction for conduct which it is powerless to proscribe.
Id. at 239, 31 S.Ct. 145 (emphasis added). Succinctly put, “[w]hat the state may not do directly it may not do indirectly.” Id. at 244, 31 S.Ct. 145. “If it cannot punish the servant as a criminal for the mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by creating a statutory presumption which, upon proof of no other fact, exposes him to conviction and punishment.” Id. Likewise here, because the State cannot directly authorize the execution of the mentally retarded, it cannot do so indirectly by creating a statutory burden of proof which assures the same result. And whether a state procedural or evidentiary rule transgresses a constitutional command is judged by whether “the natural operation of the statute” produces the proscribed result, not whether the statute or its enactors betray such an intention. Id. Although the Georgia state court in this case was constrained by these binding Supreme Court holdings, it utterly failed to “correctly identify]” this precedent, Williams, 529 U.S. at 406, 120 S.Ct. 1495, and instead “applied a rule that contradicts” it, Putman, 268 F.3d at 1241, *1369 thus depriving the state court’s decision of AEDPA deference.
In Speiser v. Randall, the Court again imposed express constitutional limits on state procedural rules implicating federal constitutional rights in the specific context of confronting a state law placing the burden of proof on an individual. 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).[5] The Court declared that when federal constitutional rights are at issue, the State “must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights.” Id. at 521, 78 S.Ct. 1332. More explicitly, because the vindication of a legal right often turns on the fact-finding process “the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied.” Id. at 520, 78 S.Ct. 1332. “[T]he more important the rights at stake the more important must be the procedural safeguards surrounding those rights.” Id. at 520-21, 78 S.Ct. 1332. Relying on Bailey, the Court in Speiser concluded that the State’s placement of the burden of proof on the individual could not stand because it “necessarily produce[d] a result which the State could not command directly,” in that it “resulted] in a deterrence of speech which the Constitution makes free.” Id. at 526, 78 S.Ct. 1332. Again here, the state court utterly failed to identify and apply this governing Supreme Court precedent, by failing even to confront the fact that requiring an offender to prove mental retardation beyond a reasonable doubt “necessarily produce[s] a result which the State could not command directly,” id., namely, making the mildly and even moderately mentally retarded eligible for execution.[6]
More recently, in Ford v. Wainwright, the Court reiterated the constitutional limitation on a State’s power to prescribe procedures affecting the determination of a substantive constitutional right. 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). In Ford, the Court was asked to resolve two questions: “whether the Eighth Amendment prohibits the execution of the insane” and, if so, whether one is entitled to a hearing on a claim of insanity. Id. at 405, 106 S.Ct. 2595. In addressing the adequacy of the State’s procedures to determine sanity, a majority of the Court first noted that if the right was merely a state-created one, the only question would be whether the State’s procedures effected the State’s own policy of protecting the insane from execution. Id. However, a majority of the Court explained the adequacy of a State’s procedures must be viewed in a completely different light if “the Constitution places a substantive restriction on the State’s power to take the life of an insane prisoner.” *1370 Id. Having then held that the execution of the insane was prohibited by the Eighth Amendment, a majority of the Court in Ford determined that the state procedures at issue were inadequate to protect the substantive federal constitutional right of the insane not to be executed. Id. at 416, 106 S.Ct. 2595 (plurality opinion); id. at 424-25, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in judgment). As in Ford, the State’s burden of proof here is inadequate to protect the substantive federal constitutional right of the mentally retarded not to be executed. The state court disregarded this precedent in concluding that Georgia’s standard of proof was constitutional.
In sum, by holding that “Atkins does not require any specific burden of proof and explicitly leaves such procedural matters to the states” without limitation, the majority improperly defers to a state court ruling that is in direct conflict with Bailey v. Alabama and its progeny. Under these cases, a State cannot create procedures that effectively eviscerate a substantive constitutional right, but rather “must provide procedures which are adequate to safeguard against infringement of [the] constitutionally protected right[ ].” Speiser, 357 U.S. at 521, 78 S.Ct. 1332.
Thus, the question before the Supreme Court of Georgia was whether Georgia’s burden of proof eviscerates the substantive constitutional right of the mentally retarded not to be executed. Rather than answering the question, as Bailey requires, of whether Georgia’s standard of proof necessarily results in that which Atkins has held is constitutionally prohibited, the state court wholly sidestepped the requisite analysis.
The state court’s erroneous decision, to which the majority defers, instead was based on inapplicable Supreme Court precedent, further depriving the state court decision of AEDPA deference. See 28 U.S.C. § 2254(d). Rather than relying on the clearly established law of Bailey, Speiser, and Ford, the state court looked to the Supreme Court’s decision in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). In that case, the Supreme Court held that the statutory requirement of proof beyond a reasonable doubt for the state-created affirmative defense of insanity did not violate the federal constitution. Leland, 343 U.S. at 799, 72 S.Ct. 1002. The Supreme Court upheld Oregon’s standard of proof expressly because the affirmative defense was exclusively a state-created right and did not involve any federal constitutional protection. Id. at 798, 72 S.Ct. 1002. Simply put, there was no constitutional right at stake in Leland. Thus, Leland is inapposite on its own terms where the right at issue is one secured by the federal constitution. Where, as in this case, a constitutionally protected right — the Eighth Amendment — is at stake, Bailey, Speiser, and Ford, and not Leland, direct the analysis and require a different result.
The Supreme Court of Georgia’s decision fails to recognize that when a constitutional right is at issue, a State cannot chose a process that will effectively gut that right. And the majority condones this disregard of Supreme Court law by simply asserting that because Atkins did not expressly establish a particular standard of proof, the State can choose any procedural scheme it wishes. Clearly established Supreme Court law forbids this result.
III. Requiring Proof Beyond A Reasonable Doubt When Applied to the Highly Subjective Determination of Mental Retardation Eviscerates the Eighth Amendment Right of Mentally Retarded Offenders Not To Be Executed
Requiring the mentally retarded to prove their mental retardation beyond any *1371 reasonable doubt will inevitably lead, through the rule’s natural operation, to the frequent execution of mentally retarded individuals, thus depriving the mentally retarded of their constitutional right “to procedures which are adequate to safeguard against” their execution.[7] See Speiser, 357 U.S. at 521, 78 S.Ct. 1332. This is so because placing this highest of standards of proof upon such offenders places upon them practically all of the risk of an erroneous determination.[8] The risk is compounded here because the fact of mental retardation has to be based on a psychiatric diagnosis, “the subtleties and nuances” of which the Supreme Court has recognized “render certainties beyond reach in most situations.” Addington, 441 U.S. at 430, 99 S.Ct. 1804. Thus, mental retardation is almost never provable beyond a reasonable doubt (at least where contested), and the “risk” of an erroneous determination resulting in a wrongful execution approaches a near certainty.
For any factual question, “[t]he more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision.” Cruzan v. Dir., Mo. Dept, of Health, 497 U.S. 261, 283, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).[9] Accordingly, when a procedural scheme requires one party to bear the burden of establishing a particular fact by the most stringent standard of proof that our legal system recognizes — proof beyond a reasonable doubt — it reflects society’s desire that the party with the burden should bear the overwhelming risk of erroneous decisionmaking.[10] Thus, for example, because “the interests of the defendant [facing a criminal charge] are of such magnitude, ... historically they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment” — that is, by requiring proof of his guilt beyond a reasonable doubt. Addington, 441 U.S. at 423, 99 S.Ct. 1804 (emphasis added).[11] Here, despite longstanding principles,[12] the burden *1372 Georgia places on a capital offender to prove the ultimate fact on which his Eighth Amendment right depends allocates almost the entire risk of error to the offender while leaving virtually none of it with the State. In other words, Georgia has decided that it is far better to erroneously execute a mentally retarded person than to erroneously imprison for life one who is not mentally retarded.[13]
Moreover, not only is the risk of error allocated overwhelmingly to the offender, but it is also enlarged exponentially by the highly subjective nature of the inquiry into mental retardation, making it even clearer that the reasonable doubt standard unquestionably will result in the execution of those offenders that Atkins protects. Mental retardation is a medical condition that is diagnosed only through, among other things, a subjective standard that requires experts to assess intellectual functioning and to interpret the meaning of behavior long into the offender’s past. Given the imprecise nature of the mental retardation determination, “the possibility of mistaken factfinding inherent in all litigation,” Speiser, 357 U.S. at 526, 78 S.Ct. 1332 (emphasis added), becomes a near-certainty in this context.
Prior to its decision in Atkins, the Supreme Court had already expressed its doubt that psychiatric conditions could ever be proved beyond a reasonable doubt. In discussing the determination of an individual’s mental condition in the context of civil commitment, the Court recognized that “[g]iven the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether [a litigant] could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous .... The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations.” Adding- *1373 ton, 441 U.S. at 429-30, 99 S.Ct. 1804; see also Ford, 477 U.S. at 426, 106 S.Ct. 2595 (Powell, J., concurring) (explaining that the question of sanity, unlike issues of historical fact, “calls for a basically subjective judgment” that “depends substantially on expert analysis in a discipline fraught with subtleties and nuances”) (internal quotation marks omitted).
The determination of mental retardation — generally characterized as significantly subaverage intellectual functioning accompanied by significant deficits in adaptive skills that manifested before the age of eighteen[14] — presents exactly the same concerns noted in Addington and Ford. The determination inescapably rests on expert opinions, which in turn are “based on medical ‘impressions’ drawn from subjective analysis,” Addington, 441 U.S. at 430, 99 S.Ct. 1804, of scattered pieces of information, themselves distilled from the subjective views of others.
An individual’s intellectual functioning is measured through various standardized tests, the results of which are subject to variable interpretation.[15] And, the requirement that an individual possess adaptive skills impairments and that they have manifested before age eighteen further complicates the assessment. Adaptive behavior is “the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.” See AAIDD, Intellectual Disability: Definition. Classification, and Systems of Support 45 (11th ed. 2010) (“AAIDD Manual”). The AAIDD itself admits that adaptive skills impairment is an “elusive” concept, depending on interviews, observation and professional judgment for diagnosis. See AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 39-40, 89-90 (10th ed. 2002). The expert must make a subjective assessment of the individual’s actions across various contexts in numerous relevant skill areas including “communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety,” Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242, none of which is singularly determinative nor subject to quantifiable precision.
This assessment also necessarily “looks backwards — past even the time of the crime and back into the developmental period,” United States v. Hardy, 762 F.Supp.2d 849, 881 (E.D.La.2010), which may be as many as thirty years, as for Hill. According to professional standards, a proper retrospective analysis entails a “longitudinal approach of adaptive behavior that involves multiple raters, very specific observations across community environments ..., school records, and ratings by peers in the development process.” Thomas v. Allen, 614 F.Supp.2d 1257, 1290 (N.D.Ala.2009) (quoting AAIDD, User’s Guide: Mental Retardation: Definition, Classification and Systems of Support 17-20 (2007) (“AAIDD User’s Guide”)), affd, 607 F.3d 749 (11th Cir.2010). A clinician conducting this retrospective diagnosis must assess a “thorough social history” of the individual, including “investigat[ing] *1374 and organizing] ... all relevant information about the person’s life,” and “exploring] ... possible reasons for absence of data or differences in data”; she must also “[c]onduct a thorough review of school records,” and contact teachers and peers from the subject’s adolescence, looking for evidence of deficits in cognitive, adaptive, or social skills. Id. (quoting AAIDD User’s Guide, at 17-20).
Where the proof must be beyond a reasonable doubt, common sense tells us that requiring reliance on these unavoidably incomplete and subjective sources of information renders the Atkins claimant’s job a near-impossible task. Compounding the difficulty of this inherently subjective diagnosis is that all of the relevant proof will be presented to a judge or jury via the dueling views of mental health experts who have evaluated subtle and often contradictory aspects of the offender’s behavioral history, often times through second- or third-hand accounts of a long distant past not subject to direct observation. Because of the subjectivity of both the diagnosis and the documentation of the offender’s childhood, experts are bound to disagree about whether an offender is mentally retarded. Obviously, the less severe an individual’s mental retardation, the more susceptible his condition is to differing interpretations by the experts. For these offenders, the result of the experts’ dispute about whether the offender falls just within or just outside the ambit of mental retardation is some quantum of irreducible doubt — which in Georgia amounts to a death sentence.
Indeed, the Supreme Court discussed at length how Atkins himself was unable to convince a jury and the Virginia state courts that he was mildly mentally retarded because of the disagreement between his expert and the state’s expert on the meaning of his intellectual functioning and behavioral history. See Atkins, 536 U.S. at 308-09 n. 4, n. 5, n. 6, 122 S.Ct. 2242. Despite the defense expert’s testimony that Atkins had a full-scale IQ of 59 and was only the second capital defendant, out of forty, that the expert had ever found to meet the criteria for mental retardation, the state’s expert opined that Atkins was not mentally retarded but of “average intelligence, at least,” id. at 309, 122 S.Ct. 2242, and explained Atkins’s abominable academic performance by saying he “did poorly because he did not want to do what he was required to do,” id. at 309 n. 6, 122 S.Ct. 2242. And although the dissenting justices on the Virginia Supreme Court rejected the state’s expert’s opinion that “Atkins possesses average intelligence as ‘incredulous as a matter of law,’ ” id. at 310, 122 S.Ct. 2242 (quoting Atkins v. Commonwealth, 260 Va. 375, 534 S.E.2d 312, 323 (2000)), the majority of the state supreme court refused to excuse Atkins from execution “merely because of his IQ score,” id. (quoting Atkins v. Commonwealth, 534 S.E.2d at 321).
Likewise, the proceedings in Hill’s case illustrate the inherent challenge of proving the fact of mental retardation beyond a reasonable doubt, again particularly for the mildly mentally retarded. After a lengthy hearing, the state habeas trial court found that Hill had proven beyond a reasonable doubt that he had an IQ indicating mild mental retardation. Yet, it also found that Hill had not demonstrated sufficient “deficits in adaptive skills functioning” béyond a reasonable doubt, only because there was no unanimity of opinion by the experts. Virtually all of the testifying experts personally met with Hill and reviewed essentially the same documentation, yet they disagreed about the meaning of Hill’s behavior during his developmental period. Thus, although the state habeas court ultimately found that *1375 Hill was probably mentally retarded,[16] it was precluded from granting Atkins relief because Georgia limited this constitutionally guaranteed right to only those individuals who could establish mental retardation beyond any reasonable doubt, a standard that cannot be met when experts are able to formulate even the slightest basis for disagreement.
Moreover, as the trial proceedings in both Atkins’s and Hill’s cases demonstrate, it is apparent that mildly mentally retarded offenders — 89% of the universe of all mentally retarded[17] — face the greatest difficulty in satisfying the standard, and are at the greatest risk of an erroneous determination that they are not mentally retarded. In the first place, their IQ score is frequently within an error range of a non-mentally retarded person. Moreover, with respect to adaptive skills, most mentally retarded individuals, especially those whose mental retardation is mild, “present a mixed competence profile.” AAIDD User’s Guide, at 16. Individuals with mild mental retardation may “manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving, and decision making, and social understanding and judgment.” Id.
These adaptive abilities are frequently mischaracterized by judicial factfinders as evidence that the individual is not retarded. Indeed, this Court and the Fifth Circuit have recognized that mildly mentally retarded individuals are capable of holding jobs, driving cars, paying bills, taking care of their families, and so forth. See Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010); Wiley v. Epps, 625 F.3d 199, 217 (5th Cir.2010); see also Holladay v. Allen, 555 F.3d 1346, 1363 (11th Cir.2009) (defendant’s expert “cogently explained” that “some of what Alabama points to as strengths are activities that an individual with mild mental retardation is capable of performing”). Therefore, the existence of the fact of mental retardation, especially in the case of mild mental retardation, will almost always be open to some doubt.
Indeed, a review of published Georgia state court cases adjudicating mental retardation in the capital context confirms just how extraordinarily difficult it is for an offender to meet the beyond a reasonable doubt standard.[18] Although Georgia *1376 has ostensibly outlawed the imposition of the death penalty for mentally retarded offenders for over twenty years, of the twenty-two reported capital cases involving mental retardation claims, only one defendant has ever successfully established his mental retardation beyond a reasonable doubt. See Lewis, 692 S.E.2d at 593.[19]
*1377 Rather than securing the constitutional right at issue, Georgia and the majority have effectively revoked that right. If an offender is erroneously found not mentally retarded, he will be executed; if an offender is erroneously found mentally retarded, the government’s only detriment is that of incarcerating for life one who is not mentally retarded. To eliminate the risk of the latter by exponentially increasing the risk of the former[20] is contrary not only to Atkins, but also to the Supreme Court’s requirement that the margin of error in fact-finding be reduced on the side of an individual’s constitutionally protected rights.[21] This utterly one-sided risk of error is all the more intolerable when the individual right at stake is a question of life or death.[22]
IV. Conclusion
No State has the power to deny citizens any of their federal constitutional rights. Atkins has recognized the federal constitutional right of mentally retarded offenders *1378 not to be executed. Georgia, therefore, cannot indirectly authorize the execution of mentally retarded offenders through a procedure that in practical operation accomplishes that result. Because Georgia’s standard of proof will inevitably result in the execution of mentally retarded offenders and thus is contrary to the dictates of Atkins, I dissent.

. Note that, at the time of Hill's 1991 criminal trial, the Eighth Amendment did not prohibit the execution of the mentally retarded. Compare Penry v. Lynaugh, 492 U.S. 302, 335, 109 S.Ct. 2934, 2955, 106 L.Ed.2d 256 (1989) (finding that the Eighth Amendment did not prohibit executions of mentally-retarded defendants), with Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (finding that the Eight Amendment prohibits such executions). Georgia’s standard, enacted in 1988, was written not as a way to enforce federal law, but rather as an expression of the State’s independent judgment that it ought not execute the mentally retarded.

. This statement assumes that Hill's criminal trial occurred after the Supreme Court decided Atkins. If Hill had raised his mental-retardation defense in during his 1991 trial, he would not have been able to argue that the beyond-a-reasonable-doubt standard conflicted with Atkins, for Atkins did not yet exist.

. Remember that the Georgia Supreme Court explicitly rejected the state post-conviction trial court’s attempt to re-open Hill's conviction via a limited writ of habeas corpus. Turpin v. Hill, 498 S.E.2d at 52, 53-54 (Ga.1998).

. The pre-AEDPA version of 28 U.S.C. § 2254(d) explicitly tied the “full and fair hearing” concept to due process. That provision provided that state court fact findings would be presumed correct unless, "the fact finding procedure employed by the state court was not adequate to afford a full and fair hearing; ... [or] the applicant was otherwise denied due process of law in the State court proceeding....” 28 U.S.C. § 2254(d)(2), (7) (1995).

. This appears to have happened in Hill’s case. Both the defense and the State presented the testimony of highly qualified, reputable expert witnesses. Hill's expert opined that Hill had significant adaptive-functioning limitations and therefore was mentally retarded; the State’s expert opined that he did not and therefore was not. To prevail under the beyond-a-reasonable-doubt standard, the post-conviction court had to not only agree with Hill’s expert; it had to find no basis for agreeing with the State’s expert's opinion, which served as the main source of reasonable doubt against Hill's mental-retardation defense.

.And, assuming he was granted a hearing, he would have to rebut the state court's finding that he was not mentally retarded with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. *1365 231, 266, 125 S.Ct. 2317, 2340, 162 L.Ed.2d 196 (2005).

. Georgia is the only state to require proof of mental retardation beyond a reasonable doubt. Of those other states that impose the death penalty, twenty-three states and the federal government require the offender to prove his mental retardation by a preponderance of the evidence (Alabama, Arkansas, California, Idaho, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Washington). New Mexico and Illinois both recently repealed their death penalty but previously had required a preponderance standard. Another five states — Arizona, Colorado, Delaware, Florida, and North Carolina — have adopted a clear and convincing standard. Six states, Connecticut, Kansas, Montana, New Hampshire, Oregon and Wyoming, have not set a standard of proof.

. Under AEDPA, a federal court may grant habeas relief for a claim denied on the merits by a state court when the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d). No AEDPA deference is due where preexisting Supreme Court precedent "dictate[s]” a rule or result contrary to the state court’s decision. Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Carroll v. Sec’y, DOC, 574 F.3d 1354, 1370 (11th Cir.2009). A decision is contrary to clearly established federal law if "the state court applied a rule that contradicts with the governing law set forth by Supreme Court case law.” Putman v. Head, 268 F.3d 1223, 1241 (11th Cir.2001). When the state court fails to "correctly identif[y],” Williams, 529 U.S. at 406, 120 S.Ct. 1495, or applies a rule "substantially different from,” id. at 405, 120 S.Ct. 1495, the appropriate legal rule, the state court's decision is “contrary to” Supreme Court law. Id. at 405-06, 120 S.Ct. 1495. Deciding a constitutional entitlement using a standard of proof foreclosed by Supreme Court precedent constitutes a decision that is “contrary to” federal law. See id.
The majority details a litany of unrelated cases recently handed down by the Supreme Court to remind us that AEDPA constrains our review. However, in all but one of the cases, the particular issue before the Court carried its own highly deferential standard of review, resulting in "dual layers” of deference, Renico v. Lett, -U.S.-, 130 S.Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). See Cullen v. Pinholster, -U.S. -, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) ("Our review of the California Supreme Court's decision is thus doubly deferential. We take a highly deferential look at counsel's performance [under] Strickland, through the deferential lens of § 2254(d).” (internal quotation marks and citations omitted)); Hanington v. Richter,-U.S.-, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so...." (internal quotation marks and citations omitted)); Premo v. Moore,-U.S.-, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011) (same); Lett, 130 S.Ct. at 1865 (holding that "AEDPA and our double jeopardy precedents” require "dual layers of deference”); Thaler v. Haynes,-U.S.-, 130 S.Ct. 1171, 1172-73, 175 L.Ed.2d 1003 (2010) (reviewing objection to a peremptory challenge under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which is reviewed on appeal under the "clearly erroneous” standard). By contrast, Hill’s claim is subject to only a single layer of AED-PA deference, unencumbered by a secondary layer of deference to the discretionary decisions of trial judges.

. The AAMR is now known as the American Association on Intellectual and Developmental Disabilities (AAIDD).

. In Bailey, Alabama made it a crime to enter into a contract for employment with the intent to injure or defraud an employer by refusing to perform the contracted services after being paid. Id. at 227-28, 31 S.Ct. 145. The statute also provided that failure to perform the service without refunding the money was prima facie evidence of the fraudulent criminal intent. Id. The defendant challenged his conviction arguing, inter alia, that the statutory presumption of fraudulent intent violated the Thirteenth Amendment's prohibition against involuntary servitude. Id. at 239, 31 S.Ct. 145. The Supreme Court agreed, finding that the State’s presumption was unconstitutional as a State could not "compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt" without violating the Thirteenth Amendment. Id. at 244, 31 S.Ct. 145.

. In Speiser, the Court was asked to consider the constitutionality of a state statute requiring taxpayers to bear the burden of proving that “they are not persons who advocate the overthrow of the government,” which implicated First Amendment free speech rights. 357 U.S. at 521, 78 S.Ct. 1332.

. The majority disregards Bailey and Speiser concluding that they are not Eighth Amendment cases. Indeed they are not. Instead the Court’s pronouncement that “the state may not ... interfere with matters withdrawn from its authority by the Federal Constitution,” Bailey, 219 U.S. at 239, 31 S.Ct. 145, and hence “may not do indirectly ” that which it "may not do directly,” id. at 244, 31 S.Ct. 145 (emphasis added), is a command that is not limited to only the First Amendment (Speiser) or the Thirteenth Amendment (Bailey ), but is one that applies to all federal substantive constitutional rights, including the Eighth Amendment right at issue in Atkins. Moreover, even if the challenged laws in those cases also violated individual procedural due process rights — as the majority reads these cases — the principle that State action cannot indirectly transgress substantive constitutional rights is no less the authoritative holding of Bailey and Speiser.

. The State itself at oral argument recognized that Georgia’s standard of proof beyond a reasonable doubt will result in the execution of some mentally retarded offenders.

. The Supreme Court has explained that the beyond a reasonable doubt standard shifts "almost the entire risk of error” to the party bearing the burden of proof. Addington v. Texas, 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

. See also Cooper v. Oklahoma, 517 U.S. 348, 366, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) ("A heightened standard [of proof) does not decrease the risk of error, but simply reallocates that risk between the parties.”); Adding-ton, 441 U.S. at 423, 99 S.Ct. 1804 ("The standard [of proof) serves to allocate the risk of error between the litigants.”).

. As Justice Harlan explained in his concurring opinion, “[b]ecause the standard of proof affects the comparative frequency of ... erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each.” In re Winship, 397 U.S. 358, 371, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

. This reflects society’s belief that "it is far worse to convict an innocent man than to let a guilty man go free.” In re Winship, 397 U.S. at 372, 90 S.Ct. 1068 (Harlan, J., concurring).

. See Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion) (“When a defendant’s life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed.”); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) ("Because of th[e] qualitative difference [between life imprisonment and punishment by death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.” (internal citation omitted)).

. The majority's argument on this point is internally inconsistent. On the one hand, the majority refuses to accept the possibility of error, arguing that because the states have unchecked authority to choose the procedures by which an offender must establish the fact of mental retardation, one who partakes of those procedures but fails to be labeled by the State as mentally retarded is therefore conclusively not mentally retarded. Under this reasoning, there can be no such thing as an erroneous determination of mental retardation — an offender is mentally retarded if and only if the output of the State's procedures declares him to be. By contrast, the majority later admits that "[ejvery standard of proof allocates some risk of an erroneous factual determination to the defendant and therefore presents some risk that mentally retarded offenders will be executed in violation of Atkins," and, under any standard of proof, there is a risk "that the trier of fact will conclude that the offender is not mentally retarded when, in fact, he is.” The majority cannot have it both ways.
Moreover, the majority's assertion that the beyond a reasonable doubt standard is not contrary to Atkins because it is merely "one aspect of a multifaceted fact-finding process under Georgia law” is beside the point. No matter how many procedures, hearings, and evidentiary opportunities Georgia provides, the law remains that every one of those procedural opportunities will be governed by one, and only one, standard of proof — beyond a reasonable doubt. Thus, the majority's concern that it is erroneous to consider the constitutionality of the standard of proof in isolation from the panoply of Georgia’s procedures is of no moment. In resolving whether Georgia’s standard of proof of beyond a reasonable doubt is contrary to Atkins' s command, it is understood that the entirety of the procedural scheme for the factual determination of mental retardation, including each of the specific procedural "rights” that the majority cites, is subjected to the most exacting standard of proof that our legal system tolerates. Thus, just as the majority urges that "we should not ignore the full range of rights available to a capital defendant claiming mental retardation,” we cannot ignore that each and every one of those "full range of rights” is constrained by the beyond a reasonable doubt standard of proof.

. Georgia’s definition of mental retardation essentially tracks the authoritative medical definitions quoted by the Supreme Court in Atkins. See 536 U.S. at 308 n. 3, 122 S.Ct. 2242, (quoting DSM-IV; AAMR 1992 Manual); see Ga.Code Ann. § 17-7-131(a)(3).

. For example, this circuit has recognized that the statistical phenomenon known as the Flynn Effect and the Standard Error of Measurement of plus or minus 5% can be applied by a test administrator to an individual’s raw IQ test score when arriving at a final IQ score. See Thomas v. Allen, 607 F.3d 749, 753, 757-58 (11th Cir.2010).

.The majority suggests that there is no finding in this case that Hill is mentally retarded by a preponderance of the evidence. There is no question that the state habeas court found this to be a fact. See Head v. Hill, No. 94-V-216, Order on Petitioner's Motion for Reconsideration of Denial of Habeas Relief (Ga.Super.Ct. Nov. 19, 2002) ("Under [the preponderance] standard, this Court would find Petitioner to be mentally retarded.''). That the state habeas court, on remand, complied with the mandate of the state supreme court to apply the higher standard of proof does not alter the fact that the state habeas court would have found Hill to be mentally retarded under a less stringent standard of proof.
The majority’s efforts on several occasions to engage in its own speculation about Hill's mental retardation is not only an impermissible attempt to re-adjudicate the fact of Hill's mental retardation but also goes astray of the sole legal question before this en banc court.

. The mildly mentally retarded comprise the largest percentage of the universe of mentally retarded individuals who would be in the position to mount an Atkins claim. See Penry, 492 U.S. at 333, 109 S.Ct. 2934 (noting that "most retarded people who reach the point of sentencing are mildly retarded"); Marc J. Tasse, Adaptive Behavior and the Diagnosis of Mental Retardation in Capital Cases, 16 Applied Neuropsychology 114, 117 (2009) (noting that the mildly mentally retarded make up the "vast majority of Atkins claims, if not all”).

. See Hall v. Lewis, 286 Ga. 767, 692 S.E.2d 580 (2010); Foster v. State, 283 Ga. 47, 656 S.E.2d 838 (2008); Ledford v. Head, 2008 WL 754486 (N.D.Ga.2008); Rogers v. State, 282 *1376 Ga. 659, 653 S.E.2d 31, 35 (2007); Schofield v. Holsey, 281 Ga. 809, 642 S.E.2d 56 (2007); Perldnson v. State, 279 Ga. 232, 610 S.E.2d 533 (2005); Morrison v. State, 276 Ga. 829, 583 S.E.2d 873 (2003); Head v. Stripling, 277 Ga. 403, 590 S.E.2d 122 (2003); Headv. Hill, 111 Ga. 255, 587 S.E.2d 613 (2003); Headv. Ferrell, 274 Ga. 399, 554 S.E.2d 155 (2001); Foster v. State, 272 Ga. 69, 525 S.E.2d 78, 79 (2000); Kingv. State, 213 Ga. 258, 539 S.E.2d 783 (2000); Heidler v. State, 273 Ga. 54, 537 S.E.2d 44 (2000); Torres v. State, 212 Ga. 389, 529 S.E.2d 883 (2000); Lyons v. State, 271 Ga. 639, 522 S.E.2d 225 (1999); Palmer v. State, 271 Ga. 234, 517 S.E.2d 502 (1999); Stephens v. State, 270 Ga. 354, 509 S.E.2d 605 (1998); Jenkins v. State, 269 Ga. 282, 498 S.E.2d 502 (1998); Mosher v. State, 268 Ga. 555, 491 S.E.2d 348 (1997); Raulerson v. State, 268 Ga. 623, 491 S.E.2d 791 (1997); Burgess v. State, 264 Ga. Ill, 450 S.E.2d 680 (1994); Williams v. State, 262 Ga. 732, 426 S.E.2d 348 (1993).
To support its conclusion that "there is no evidence ... that the reasonable doubt standard triggers an unacceptably high error rate for mental retardation cases,” the majority suggests that it is relevant that in five of these cases the defendants received a life sentence instead of a death sentence. In each of the cases, however, the defendant received a life sentence for reasons unrelated to his asserted mental retardation, even though he had raised a claim of mental retardation.
The majority also cites to four non-capital cases — Marshall v. State, 276 Ga. 854, 583 S.E.2d 884, 886 (2003); Chauncey v. State, 283 Ga.App. 217, 641 S.E.2d 229, 230 (2007); Laster v. State, 234 Ga.App. 16, 505 S.E.2d 560, 561 (1998); and Moody v. State, 205 Ga.App. 376, 422 S.E.2d 70, 70 (1992) — as proof that juries and judges in Georgia do find defendants to be mentally retarded. The majority fails to acknowledge, however, that although the verdict of "guilty but mentally retarded” is available in both capital and non-capital felony cases, see Ga.Code Ann. § 17-7 — 131(b)(1), the determination of mental retardation is of consequence only in capital cases. Non-capital offenders who are found "guilty but mentally retarded” are sentenced no different than any other defendant under Georgia's law. Id. § 17 — 7—131(g)(1) ("Whenever a defendant is found ... guilty but mentally retarded, ... the court shall sentence him or her in the same manner as a defendant found guilty of the offense.”). Thus, because the stakes for mental retardation claims are exponentially higher in capital cases, the State is much more likely to vigorously oppose the assertion of mental retardation in a capital case. See Bobby v. Bies, 556 U.S. 825, 129 S.Ct. 2145, 2153, 173 L.Ed.2d 1173 (2009) (“[Pjrosecutors, pre-Atkins, had little incentive vigorously to contest evidence of retardation. [Atkins’s prohibition on execution of the mentally retarded] substantially altered the State’s incentive to contest [offenders’] mental capacity....”). This bears out in the four cases the majority relies on and one additional as well. See Sims v. State, 279 Ga. 389, 614 S.E.2d 73, 75 (2005). Indeed, of the nine reported non-capital cases in Georgia in which mental retardation was at issue, the defendant was able to successfully establish his mental retardation in five of them.
The majority also notes that in Walker v. State, 282 Ga. 774, 653 S.E.2d 439, 447 (2007), the co-defendant Griffin had been "adjudicated mentally retarded.” However, Griffin entered a plea of “guilty but mentally retarded,” rather than receiving that verdict at trial. See Brief On Behalf of the Appellee By the Attorney General, Walker, 282 Ga. 774, 653 S.E.2d 439 n. 5 (2007). Under Georgia law, to accept a plea of "guilty but mentally retarded,” a judge need not find the defendant mentally retarded beyond a reasonable doubt but need only find that there is a factual basis that the defendant is mentally retarded. Ga.Code Ann. § 17-7-131(b)(2).

. And in that case, the State did not even mount a credible challenge to the offender's claim. Three experts testified that the offender was mentally retarded, and the state habeas court found their testimony scientifically sound and credible. Response Brief of Appellee/Petitioner, Lewis, 286 Ga. 767, 692 S.E.2d 580 (2009). By contrast, the state habeas court found the State’s psychologist to be a "hired gun” who lacked expertise in the field *1377 of mental retardation and whose opinion was a "sham” premised on a repeated willingness to disregard the established standards of the psychological profession. Id. On the basis of these factual findings, the court found the petitioner had established mental retardation beyond a reasonable doubt. Id. The State never challenged this determination. Lewis, 692 S.E.2d at 593. Notably, no other capital offender in any reported case has ever been able to establish his mental retardation beyond a reasonable doubt so as to avail himself of Georgia's prohibition on execution of the mentally retarded.

. The Supreme Court has recognized that these two types of error are inversely related, and that the beyond a reasonable doubt standard of proof reduces the risk of one type of error by maximally increasing the risk of the opposite error. Addington, 441 U.S. at 423-24, 99 S.Ct. 1804 (beyond a reasonable doubt standard "exclude[s] as nearly as possible” the risk of one type of error by shifting "almost the entire risk of error” to the other party). The ratio between the two types of errors yielded by the beyond a reasonable doubt standard has been estimated at ten to one. See 4 W. Blackstone, Commentaries 358 ("[T]he law holds[] that it is better that ten guilty persons escape, than that one innocent suffer.”). That is, in this context, it will produce roughly ten executions of mentally retarded individuals for every one non-mentally retarded individual erroneously spared from execution.

. Several Supreme Court cases establish that states may not require the individual putative holder of a substantive constitutional right to bear a significant majority of the risk of an erroneous determination of a fact that implicates the right. See e.g., Cooper, 517 U.S. at 364-65, 116 S.Ct. 1373 (holding unconstitutional the requirement that a defendant to prove competence to stand trial by clear and convincing evidence because the consequences "of an erroneous determination of competence are dire” for defendant while "the injury to the State of the opposite error— a conclusion that the defendant is incompetent when he is in fact malingering — is modest”); Addington, 441 U.S. at 427, 99 S.Ct. 1804 (requiring the State to meet a heightened clear-and-convincing standard for civil involuntary commitment because a defendant with liberty at stake "should not be asked to share equally with society the risk of error”); Santoslcy v. Kramer, 455 U.S. 745, 755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (requiring the State to bear a heightened burden of at least clear and convincing evidence in parental termination proceedings, which the Court recognized involved a parent’s fundamental liberty interest in the care, custody, and management of their child).

.“In capital proceedings generally, [the Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability ... [because] execution is the most irremediable and unfathomable of penalties.” Ford, 477 U.S. at 411, 106 S.Ct. 2595 (plurality opinion). "When the choice is between life and death, th[e] risk [that the death penalty will be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (Burger, C.J.) (plurality opinion).